TRENTON H. NORRIS (CA Bar No. 164781)
trent.norris@hoganlovells.com
ALEXANDER TABLAN (CA Bar No. 346309)
alexander.tablan@hoganlovells.com
ANDREW MUSE-FISHER (CA Bar No. 364086)
andrew.muse-fisher@hoganlovells.com
HOGAN LOVELLS US LLP
Four Embarcadero Center, 35th Floor
San Francisco, CA 94111-4024
Telephone:      415.374.2300
Facsimile:      415.374.2499

GREGORY G. SPERLA (CA Bar No. 278062)
greg.sperla@dlapiper.com
DLA PIPER LLP
1415 L Street, Suite 270
Sacramento, CA 95814-3976
Telephone:      916.930.3200
Facsimile:      916.930.3201

WILLIS WAGNER (CA Bar No. 310900)
will.wagner@gtlaw.com
TAMARA WIESEBRON (CA Bar No. 338967)
tamara.wiesebron@gtlaw.com
ALEXANDRA LIZANO (CA Bar No. 334294)
alexandra.lizano@gtlaw.com
GREENBERG TRAURIG LLP
400 Capitol Mall, Suite 2400
Sacramento, CA 95814-4428
Telephone:      916.442.1111
Facsimile:      916.448.1709

Attorneys for Plaintiff THE PERSONAL CARE PRODUCTS COUNCIL

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE PERSONAL CARE PRODUCTS COUNCIL,<br><br>Plaintiff,<br><br>v.<br><br>ROB BONTA, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE STATE OF CALIFORNIA,<br><br>Defendant. | Case No. _____<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Plaintiff The Personal Care Products Council ("Plaintiff" or "PCPC") seeks prospective declaratory and injunctive relief against Defendant Rob Bonta, in his official capacity as Attorney General of the State of California, and alleges as follows:

**PRELIMINARY STATEMENT**

1.     PCPC brings this suit to enjoin Defendant and those in privity with and acting in concert with Defendant from enforcing in the future a requirement to provide a false, misleading, and highly controversial cancer warning for cosmetic and personal care products that contain the substance diethanolamine (hereinafter, "DEA").

2.     DEA is used as an ingredient in cosmetic and personal care products, including shampoos, conditioners, hair gels, hair dyes, shaving gels, makeup, body lotions, sunscreens, and skin care products. DEA is used for its properties as a surfactant, emulsifier, and acid neutralizer. It is also used to make laundry and dish detergents, food packaging, and textiles.

3.     DEA is also used to create other compounds that are used as ingredients in similar products. In such cases, DEA can be present in trace amounts in a product as a result of the manufacturing process for such compounds. One such ingredient that is in widespread and longstanding use in cosmetic and personal care products is triethanolamine.

4.     In 2010, the International Agency for Research on Cancer ("IARC") published its formal conclusion that DEA is "possibly carcinogenic to humans (Group 2B)" based on "sufficient evidence in experimental animals for the carcinogenicity of [DEA]." IARC made its determination on the basis of one study that showed a possible link between DEA and cancer in a strain of laboratory mice known to be highly susceptible to the development of cancers. Additionally, a parallel study found no link between DEA and cancer in laboratory rats. IARC could not identify **any** study that established a link between DEA and cancer in humans. IARC also concluded: "There is inadequate evidence in humans for the carcinogenicity of [DEA]." IARC, *Some Chemicals Present in Industrial and Consumer Products, Food and Drinking-water*, 101 IARC Monographs on the Evaluation of Carcinogenic Risks to Humans, at 136.

5.     As a result of the IARC determination that DEA is "possibly carcinogenic to humans," California's Office of Environmental Health Hazard Assessment ("OEHHA") listed

1

DEA as a chemical "known to the State to cause cancer" under California's Safe Drinking Water and Toxic Enforcement Act of 1986 ("Proposition 65") on June 22, 2012.

6.      Under California law, OEHHA was required to list DEA as "known to the State to cause cancer" without making its own independent scientific determination as to the carcinogenicity of the substance. *Monsanto Co. v. Off. of Env't Health Hazard Assessment*, 22 Cal. App. 5th 534, 561 (2018). Indeed, no California agency has made any scientific determination as to whether DEA causes cancer in humans. Nor has any federal agency done so.

7.      Under Proposition 65, businesses are required to warn consumers about an exposure to any substance that OEHHA has listed as "known to the State to cause cancer," unless an exemption or affirmative defense to the warning requirement applies.

8.      As a result of OEHHA's listing of DEA, and despite scientific studies acknowledging a lack of evidence showing that exposure to DEA in cosmetic and personal care products increases the risk of cancer in humans, businesses that manufacture, distribute, or sell cosmetic and personal care products in California that contain DEA are presumptively required to provide a Proposition 65 cancer warning for their products. Businesses are required to provide this message to consumers even though neither OEHHA nor any other governmental entity has determined that DEA is a known human carcinogen.

9.      A Proposition 65 cancer warning for DEA in cosmetic and personal care products conveys to consumers the false and misleading message that using the products will increase consumers' risk of cancer, even though there is no evidence that exposure to DEA in cosmetic and personal care products increases the risk of cancer in humans.

10.      California's presumptive requirement that businesses provide a Proposition 65 cancer warning for cosmetic and personal care products that contain DEA therefore violates the First Amendment of the United States Constitution by compelling PCPC's members and other entities that manufacture, distribute, or sell such cosmetic and personal care products to make false, misleading, and highly controversial statements about their products.

11.      In addition to being unconstitutional, California's treatment under Proposition 65 of cosmetic and personal care products that contain DEA harms both businesses and the public.

Businesses, including many of PCPC's members, must either take action to provide false, misleading, and highly controversial warnings to California consumers about the safety of their cosmetic and personal care products, or face potential costly enforcement actions initiated by Defendant or private enforcers for failing to do so.

12. Members of the public, meanwhile, will be misled about the risks posed by cosmetic and personal care products containing DEA, potentially frightening them away from using a variety of safe products they may have been using for years or increasing their anxiety about the risk of cancer from common household products.

13. Given the lack of scientific evidence suggesting a causal relationship between DEA in cosmetic and personal care products and cancer risk in humans, requiring cancer warnings for DEA in cosmetic and personal care products also will result in over-warning, diluting the effectiveness of Proposition 65 warnings on other products that actually warrant them and diminishing consumers' understanding of, and confidence in, public health messages and the authorities who promulgate them.

14. For these reasons, the Court should declare that mandating Proposition 65 cancer warnings for DEA in cosmetic and personal care products is unconstitutional under the First Amendment and, with respect to Proposition 65 claims that are not currently pending in state court and that concern DEA in cosmetic and personal care products, enjoin Defendant and those in privity with and/or acting in concert with Defendant (including Proposition 65 private enforcers) from enforcing the Proposition 65 warning requirement as applied to DEA in cosmetic and personal care products.

**PARTIES**

15. Plaintiff The Personal Care Products Council is a nonprofit business association with a membership of approximately 600 businesses in the cosmetics and personal care industries. PCPC members supply ingredients for cosmetic and personal care products, manufacture cosmetic and personal care products, license their brands for use on cosmetic and personal care products, and sell cosmetic and personal care products in California and around the world. PCPC advocates for its members and the broader cosmetic and personal care industry before Congress and state and

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

local legislative bodies, regulatory agencies, and courts. Because so many of its members are directly impacted by Proposition 65, PCPC has historically been and continues to be deeply involved in a variety of Proposition 65-related regulatory and litigation matters in addition to such matters related to other laws that regulate cosmetic and personal care products. Specifically, PCPC has coordinated and spearheaded policy discussions on Proposition 65 and cosmetic/personal care product issues involving business leaders, policy makers, scientists, and advocacy groups in both regulatory and legislative forums. PCPC has also closely monitored proposed listings of chemicals and other regulatory activities under Proposition 65, has advised its members on these issues, and has represented its members in policy discussions where the cosmetic industry may be affected. PCPC has participated in the regulatory process initiated by OEHHA to establish a "safe harbor" No Significant Risk Level for DEA. PCPC has also sued to challenge the constitutionality of Proposition 65's warning requirement for another ingredient in cosmetic and personal care products, titanium dioxide, which resulted in judgment in PCPC's favor. *See* Order, ECF No. 56, *Personal Care Prods. Council v. Bonta*, No. 2:23-cv-01006 (Nunley, J.) (Aug. 11, 2025).

16.     Defendant Rob Bonta is the Attorney General of the State of California and the highest-ranking officer in the California Department of Justice. Attorney General Bonta is sued in his official capacity. He performs his official duties in Sacramento and throughout the State of California. As Attorney General, he is specifically empowered to enforce the provisions of Proposition 65 and to defend challenges to the constitutionality of all state statutes and regulations, including Proposition 65 and its implementing regulations.

**JURISDICTION AND VENUE**

17.     This Court has jurisdiction over this action under 28 U.S.C. § 1331, which confers original jurisdiction on federal district courts over actions arising under the Constitution or laws of the United States.

18.     Venue is proper under 28 U.S.C. § 1391(b)(1) and (b)(2), because the Attorney General is located within this district and a substantial part of the events giving rise to PCPC's claims occurred in this district.

**FACTUAL BACKGROUND**

**A.    Overview of DEA in Cosmetic and Personal Care Products**

19.    Cosmetic and personal care product manufacturers have used DEA for decades to produce surfactants and emulsifiers. DEA is also used to create diethanolamides and DEA salts, which are also common ingredients in cosmetic and personal care products. Products that contain diethanolamides and DEA salts may contain trace amounts of DEA.

20.    DEA and DEA-related compounds have numerous useful properties. Because they are effective surfactants and emulsifiers, DEA and related compounds are commonly used to make shampoos, conditioners, hair gels, hair dyes, shaving gels, makeup, body lotions, sunscreens, and skin care products. DEA is also used in laundry and dishwashing detergents, and in the creation of food packaging and textiles. DEA also helps increase viscosity, neutralize acidity, and decrease corrosion in products.

21.    Under its Safe Cosmetics Program, the State of California requires manufacturers of cosmetic products to report those that contain DEA, DEA-related compounds, and other ingredients. California makes this information available to the public in the form of the California Safe Cosmetics Program Product Database, which can be searched online at https://cscpsearch.cdph.ca.gov/search/publicsearch. As of January 26, 2026, that database identifies 2,566 cosmetic products that are reported to contain DEA and DEA-related compounds such as Cocamide DEA, Lauramide DEA, Triethanolamine, and Cocamide Monoethanolamine.

22.    DEA is a recognized cosmetic ingredient listed in the International Cosmetic Ingredient Dictionary and Handbook, which is the authoritative source that FDA directs cosmetic companies to use in designating ingredients on cosmetic labels. 21 C.F.R. § 701.3. Like all ingredients that are used intentionally in cosmetics (other than fragrances or flavors), DEA and related compounds must be listed on the label of each package. *Id.* Trace amounts of DEA that may be found in other ingredients, such as triethanolamine, are not required to be listed on package labels.

**B.    No Study Demonstrates That DEA Increases the Risk of Cancer in Humans.**

23.    Current scientific evidence does not support a finding that exposure to DEA from

cosmetic or personal care products increases the risk of cancer in humans.

24.    Epidemiological studies are critical for determining whether a substance poses a real cancer risk in human populations. The United States Environmental Protection Agency (EPA) defines epidemiology as "*the study of the distribution of disease in human populations and the factors that may influence that distribution.*" Yet no such epidemiological studies exist for DEA. Absent epidemiological data, the evaluation of DEA's potential carcinogenicity necessarily relies largely on experimental animal studies.

25.    Only one toxicological study has indicated that DEA causes an increase in tumors in a certain strain of laboratory mice. That study is of questionable relevance to humans. Further, available data shows that humans absorb DEA dermally at substantially lower rates than mice. Other studies have not shown a possible link between dermal exposure to DEA and cancer in experimental animals other than mice. Finally, there is no reliable evidence that dermal application of DEA causes cancer in humans.

26.    IARC's classification of DEA as "possibly carcinogenic to humans" is largely based on one 1999 study that identified a possible link between DEA and cancer in the B6C3F1 strain of mice by dermal exposure. Nat'l Toxicology Program, *NTP Technical Report on the Toxicology and Carcinogenesis Studies of Diethanolamine (CAS NO. 111-42-2) in F344/N Rats and B6c3f1 Mice (Dermal Studies)*, 478 NAT'L TOXICOLOGY PROGRAM TECH. REP. SER. 1-212 (July 1999) ("NTP Study"). This is the only study cited by IARC finding any link between DEA and cancer, and the potential link appears only in the B6C3F1 strain of mice, which have a high background cancer incidence.

27.    In 2000, IARC reviewed the evidence of DEA carcinogenicity, including the NTP study of the B6C3F1 mice. IARC classified DEA as Group 3, meaning "not classifiable as to its carcinogenicity to humans." IARC's initial decision to classify DEA as a Group 3 substance is based on the same data that it used in 2012 to come to the different conclusion of classifying DEA as a Group 2B substance. In 2002, the NTP, which conducted the B63CF1 mouse study, also determined not to classify DEA as a human carcinogen because its analysis found (1) no evidence that DEA is mutagenic or metabolized to a mutagen, and (2) the DEA choline-deficiency mode of

action observed in B6C3F1 mouse strains is not relevant to humans.

28.    Furthermore, the European Union's Registration, Evaluation, Authorisation, and Restriction of Chemicals (REACH) program noted several limitations when reviewing the NTP study in 2021. German Fed. Inst. for Occupational Safety & Health, *Substance Evaluation Conclusion and Evaluation Report for 2,2'-Iminodiethanol (DEA), EC No. 203-868-0*, 24 (2021). First, the specific strain of mice (B6C3F1) studied is known to have a "high incidence of benign liver [tumors]." And according to the 1999 NTP mice study cited by IARC, the tumors found in the mice (which were exclusively B6C3F1 mice) predominantly appeared in the liver. Second, the mice were not limited in their caloric intake, which is "known to be a risk factor of liver [tumors]" in the strain of mice studied. Third, the study did not prevent mice from grooming themselves, potentially enabling oral exposure to DEA. This raises a question of whether the study carefully controlled for only dermal exposure. Finally, the DEA was applied to the mice in combination with ethanol.

29.    At most, evidence showing a possible link between dermal exposure to DEA and cancer is limited to the B6C3F1 strain of mice. Indeed, the B6C3F1 strain of mice have a choline-deficiency mode of action that is unique to that specific strain of mice and not relevant to humans. In addition, the B6C3F1 mice possess genetically controlled deficiencies in maintaining DNA methylation, a key protective mechanism for resisting tumors, making the strain inherently prone to developing tumors at extremely high rates.

30.    The Organization for Economic and Cooperative Development (OECD) has specifically noted that B6C3F1 mice have limited usefulness in carcinogenicity testing, and cautioned "the need for comparative species analysis when evaluating liver tumor induction in the B6C3F1 mice." Similarly, the fundamental physiological difference between the B6C3F1 mice and humans has led the National Cancer Institute and the European Chemicals Agency (ECHA), among other organizations, to question the suitability of using B6C3F1 mice studies for human carcinogenicity testing in general.

31.    One key characteristic of many carcinogens is injury to DNA that transitions to mutations and ultimately cancer outcomes, which could be a potential explanation for the B6C3F1 mice liver tumors. DEA has been tested in multiple genotoxicity assays including evaluation of

mutagenic, clastogenic, aneugenic, and DNA damage, and these assays show negative findings. This data confirm that DEA does not cause tumors through a genotoxic mode of action.

32.     Later studies of the effects of dermal exposure to DEA on other strains of mice showed no indication that DEA is carcinogenic. *See* Judson W. Spalding et al., *Responses of Transgenic Mouse Lines p53(+/-) and Tg.AC to Agents Tested in Conventional Carcinogenicity Bioassays*, 53 TOXICOLOGICAL SCI. 213, 221 (2000). Further, the researchers who found a possible link in mice in the NTP Study performed a parallel study on rats using the same methodology. However, they found "no evidence of carcinogenic activity" in rats.

33.     Studies also suggest that humans absorb less DEA applied dermally compared to mice and rats. For example, a study evaluating absorption rates of DEA applied to excised skin showed that permeability "through mouse skin was approximately 10 times higher than that through rat skin and about 20 times higher than that through human skin." James D. Sun et al., *In Vitro Skin Penetration of Monoethanolamine and Diethanolamine Using Excised Skin from Rats, Mice, Rabbits, and Humans*, 15 J. CUTANEOUS & OCULAR TOXICOLOGY 131, 131–46 (1996).

34.     IARC could not identify any studies establishing an association between DEA and cancer in humans. Instead, IARC discussed a number of studies examining cancer rates in workers exposed to metalworking fluids in occupational settings. Ethanolamines, including diethanolamine, are commonly used as additives in metalworking fluids, as are other chemicals that have been designated as carcinogens by IARC and other bodies.

35.     These studies do not support that DEA is carcinogenic in humans. As IARC acknowledges, "[m]etalworking fluids are complex mixtures that may vary considerably, depending on the type of fluid and the additives used. These mixtures may contain many potential carcinogens . . . ." Because these studies (1) could not identify whether the workers were in fact exposed to diethanolamine, (2) considered metalworking fluids that contain other chemicals designated as carcinogens, and (3) did not control for a specific exposure route, IARC concluded that "any observed elevations in risk cannot be specifically attributed to diethanolamine or to any other constituent of the complex mixtures."

36.     IARC's classification of DEA as a "possible" human carcinogen was therefore

limited to one study of questionable relevance that found a link between DEA and cancer only in one strain of mice, not rats (and certainly not humans). And IARC expressly found: "There is inadequate evidence in humans for the carcinogenicity of DEA." *See* ¶ 4, *supra.*

37.    OEHHA's listing of DEA is based solely on the IARC classification.

**C.    Federal, State, and Foreign Bodies Recognize a Lack of Evidence Showing an Association Between DEA and Cancer in Humans.**

38.    Current FDA guidance states that "there is no reason for consumers to be alarmed based on the use of [DEA and DEA-related ingredients] in cosmetics." FDA, *Diethanolamine*, https://www.fda.gov/cosmetics/cosmetic-ingredients/diethanolamine (last visited Feb. 28, 2026). The FDA further recognizes that "[t]he [NTP Study] did not establish a link between DEA and the risk of cancer in humans." *Id.*

The FDA has long accepted DEA as safe and appropriate for use in cosmetics and other products. For instance, the agency approved an oral pharmaceutical, treprostinil diolamine, which contains approximately 21% DEA, and does not require a cancer warning label on the product. In addition, the FDA inactive ingredient website explicitly approves the use of DEA in intravenous injections up to 1.5% w/v and in topical creams at up to 0.3% w/v.

39.    Other U.S. agencies have similarly recognized a lack of data showing a link between DEA and cancer in humans. The EPA reviewed DEA and its potential health risks, including the data from the NTP Study. However, the EPA concluded that "[n]o information is available on the carcinogenic effects of [DEA] in humans." EPA, *Diethanolamine: 111-42-2*, https://www.epa.gov/sites/default/files/2016-09/documents/diethanolamine.pdf (last visited Feb. 28, 2026). The National Toxicology Program (NTP) – the entity responsible for the 1999 study identifying a possible link between DEA and cancer in a specific strain of mice – also decided not to list DEA in its Report on Carcinogens, due to a lack of sufficient data. Nat'l Toxicology Program, REP. ON CARCINOGENS app. C at 1 (15th ed. 2021). The Report on Carcinogens is a Congressionally authorized, science-driven list that identifies substances "that are known or reasonably anticipated to cause cancer in humans." NTP, *15th Report on Carcinogens*, https://ntp.niehs.nih.gov/research/assessments/cancer/roc (last visited Feb. 28, 2026).

40.    Even OEHHA—California's regulatory body tasked with assessing exposures to chemicals—previously acknowledged there was insufficient data available to claim that DEA causes cancer in humans. As discussed below, one method by which OEHHA may add a chemical to the Proposition 65 list of chemicals known to the state to cause cancer is when an identified authoritative body identifies a chemical as causing cancer. Cal. Health & Safety Code § 25249.8(b); *see also infra* ¶ 41. OEHHA first considered listing DEA in 1999 after reviewing a prior NTP study from 1997 evaluating the carcinogenicity of DEA. NTP qualifies as an authoritative body whose determinations can result in a chemical being added to the Proposition 65 list. However, after reviewing available scientific findings about DEA and public input, OEHHA decided in 2003 not to list DEA via this mechanism because it was "not clear that the scientific criteria for listing under the authoritative bodies mechanism" had been met. OEHHA, *Decision Not to Proceed with the Listing of Diethanolamine Via the Authoritative Bodies Listing Mechanism* (Mar. 7, 2003), https://oehha.ca.gov/sites/default/files/media/downloads/crnr/deanogo.pdf (last visited Feb. 28, 2026).

41.    Foreign and multinational bodies have expressed skepticism toward the 1999 NTP Study on which IARC's determination, and in turn OEHHA's listing, is based. The Australian Industrial Chemical Introduction Scheme announced that "it cannot be concluded that [DEA] has carcinogenic potential to humans" because of lack of data supporting the extension of the choline deficiency mechanism identified in mice to humans. Nat'l Indus. Chems. Notification & Assessment Scheme, *Ethanol, 2'2'-iminbis-: Human Health Tier III Assessment CAS Number 111-42-2*, at 2 (2016). As noted above, as part of the REACH program, EU member states reviewed the NTP Study. The review concluded only that DEA is a "suspected human carcinogen," not a "known" or "presumed" carcinogen. German Fed. Inst. for Occupational Safety & Health, *Substance Evaluation Conclusion and Evaluation Report for 2,2'-Iminodiethanol (DEA), EC No. 203-868-0*, at 24 (2021); *see also* European Chem. Agency, *Preventing Cancer*, https://echa.europa.eu/hot-topics/preventing-cancer (last visited Feb. 28, 2026) (explaining the different categories of classifying carcinogens). The reviewing German agency based its conclusion primarily on the NTP study of mice and flagged a number of limitations in the underlying evidence,

including a lack of studies directly linking DEA and cancer in humans. German Fed. Inst. for Occupational Safety & Health at 22–24.

42.    Likewise, the European Chemicals Agency (ECHA) found that the available epidemiological and animal data were insufficient for a Category 1A or 1B carcinogenicity designation. ECHA classified DEA as a Category 2 substance, which indicates that DEA is only "suspected" of causing cancer. ECHA found that there was insufficient scientific evidence to classify DEA's human carcinogenicity potential as presumed or known. ECHA's decision to classify DEA as a "suspected human carcinogen" was based on the same studies that IARC reviewed to classify DEA as a 2B "possible carcinogen."

**D.    Proposition 65 Regulatory Framework**

43.    In 1986, California voters, by initiative, enacted the Safe Drinking Water and Toxic Enforcement Act of 1986—commonly known as Proposition 65. In relevant part, Proposition 65 prohibits businesses with ten or more employees from knowingly and intentionally exposing California residents to a chemical known to the State to cause cancer without providing required warnings, unless an exemption or affirmative defense applies. Cal. Health & Safety Code §§ 25249.6, 25249.10.

44.    Proposition 65 requires OEHHA to maintain "a list of those chemicals known to the state to cause cancer or reproductive toxicity" and provides mechanisms by which OEHHA may (or must) place a chemical on the list. *Id.* §§ 25249.8(a) – (b).

45.    As relevant here, the statute provides that the list "shall include at a minimum those substances identified by reference in Labor Code Section 6382(b)(1) and those substances identified additionally by reference in Labor Code Section 6382(d)." Cal. Health & Safety Code § 25249.8(a). Those Labor Code sections refer, by cross-reference, to classifications by IARC. As a result, once IARC determines that a chemical is at least a "possible" human carcinogen with sufficient evidence in animals, OEHHA lists it as "known to the state to cause cancer." 27 Cal. Code Regs. § 25904(b)(3). OEHHA has no discretion; the listing is automatic. *See Monsanto*, 22 Cal. App. 5th at 561.

46.    After a chemical is added to the Proposition 65 list, and following a 12-month grace

1   period, Proposition 65 requires that any "person in the course of doing business" provide a "clear

2   and reasonable warning" before "expos[ing] any individual to" the listed chemical, unless an

3   exemption or affirmative defense applies. Cal. Health & Safety Code § 25249.6.

4       47.   Although Proposition 65 does not define what content suffices to convey a "clear

5   and reasonable warning," OEHHA's regulations for more than 30 years provided that the warning

6   "must clearly communicate that the chemical in question is known to the state to cause cancer . . . ."

7   27 Cal. Code Regs. § 25601 (effective until Aug. 30, 2018). OEHHA also provided a "safe harbor"

8   for warnings that used the following language: "**WARNING**: This product contains a chemical

9   known to the State of California to cause cancer." *Id.* § 25603.2 (effective until Aug. 30, 2018).

10      48.   In August 2016, OEHHA adopted new regulations providing that safe harbor

11  Proposition 65 warnings must provide consumers with additional information.

12      49.   Under these new warning regulations, cancer warnings for cosmetic products are

13  deemed to be "clear and reasonable" if they state: "**WARNING**: This product can expose you to

14  [name of chemical], which is known to the State of California to cause cancer. For more

15  information, go to www.P65Warnings.ca.gov." 27 Cal. Code Regs. § 25603(a)(2)(A).

16  Alternatively, the warning can be provided in a short form with the following preceded by a yellow

17  triangle symbol: "**WARNING**: Cancer – www.P65Warnings.ca.gov." *Id.* § 25603(c)(2)(A).

18      50.   Proposition 65 provides a statutory exemption to the warning requirement, which

19  can be asserted as an affirmative defense in a Proposition 65 enforcement action, if "the person

20  responsible can show that the exposure poses no significant risk assuming lifetime exposure at the

21  level in question for substances known to the state to cause cancer." Cal Health & Safety Code

22  § 25249.10(c). This threshold is commonly referred to as the "No Significant Risk Level"

23  ("NSRL"). The NSRL is not a concentration limit, but rather an exposure-based limit based on the

24  highest level of exposure causing no more than a 1 in 100,000 theoretical risk of cancer over a

25  lifetime of exposure to that level. *Id.*; 27 Cal. Code Regs. § 25703(b).

26      51.   For some listed substances, OEHHA has published a quantitative NSRL, often

27  referred to as a "safe harbor" NSRL because it is a presumptive NSRL such that a private enforcer

28  cannot argue for a more stringent NSRL in litigation. 27 Cal. Code Regs. § 25705. A safe harbor

NSRL is also an exposure-based limit. All safe harbor NSRLs for listed chemicals are described in micrograms of exposure per day. *Id.* In August 2025, OEHHA proposed a safe harbor NSRL for DEA. The comment period on that proposal closed on November 7, 2025. OEHHA has not yet promulgated a safe harbor NSRL for DEA. As a result, in an enforcement action, the defendant must first establish, through scientific testimony, what the appropriate NSRL is for DEA.

52.    Under Proposition 65, to determine whether an exposure from a consumer product exceeds the NSRL (once it is established), the regulations require that exposures be calculated based on the "average rate of intake or exposure for average users of the consumer product." 27 Cal. Code Regs. § 25721(d)(4). Thus, unlike other laws and regulations affecting businesses that set concentration-based thresholds, it is not facially apparent from the NSRL described in the statute or from a safe harbor NSRL adopted by OEHHA and listed in the regulations whether there is a duty to warn under Proposition 65.

53.    Under the statute, it is the burden of a business to demonstrate that the exposure at issue does not exceed the NSRL. OEHHA has not provided any guidance concerning analytical methods or testing procedures to determine exposure levels to DEA. These methods can be quite complex because exposure to DEA in cosmetic and personal care products is via dermal exposure and so depends on concentration levels of DEA in the product, the substrate in which the DEA is found, the method of application, the duration of contact, and potentially other factors.

54.    In addition, a safe harbor NSRL provides only an "affirmative defense" to liability under Proposition 65 and does not immunize industry from enforcement actions in the first instance. *See DiPirro v. Bondo Corp.*, 153 Cal. App. 4th 150, 185 (2007).

55.    Courts have found that no warning is required where a business can demonstrate that exposures to the chemical do not pose a significant risk of cancer at any level. In *Baxter Healthcare Corporation v. Denton*, 120 Cal. App. 4th 333 (2004), the California Court of Appeal held that "a warning is not required if . . . the exposure poses no significant risk of causing cancer in humans." *Id.* at 343–44. The court determined that the chemical at issue in that case (DEHP) does not cause cancer in humans and therefore no warning was required, even though the court found that the chemical was properly listed, and DEHP remains on the list today. Importantly,

however, the court explained that the business bore the burden of proof, in an enforcement action, to establish that exposure to DEHP presented no significant risk of cancer in humans. *Id.* at 364–69.

### E.    Enforcement of Proposition 65

56.    Proposition 65 employs an unusual enforcement scheme. First, the Attorney General, a district attorney, or a variety of local government officials may bring an enforcement action under Cal. Health & Safety Code § 25249.7(c). The statute imposes penalties up to $2,500 per day for each violation. *Id.* § 25249.7(b). In addition to these penalties, the statute also provides that any person who "threatens to violate" the warning requirement may be "enjoined in a court of competent jurisdiction." *Id.* § 25249.7(a).

57.    Second, any *person* (even one who has suffered no injury in fact) may bring a private enforcement action for an alleged failure to provide an adequate warning and without having to plead or prove injury or harm. *Id.* § 25249.7(d). These private enforcers are eligible to recover 25 percent of the penalty (with the remaining 75 percent going to the State of California's Safe Drinking Water and Toxic Enforcement Fund in the State Treasury), *id.* § 25249.12, as well as their reasonable attorney fees and costs, Cal. Code Civ. Proc. § 1021.5, creating very strong incentives for private enforcement. Defendants usually cannot remove these enforcement actions to federal court because the plaintiff has no Article III standing.

58.    Private parties are required to provide 60 days' notice—to the California Attorney General, the district attorney, city attorney, or prosecutor in whose jurisdiction the violation is alleged to have occurred, and to the alleged violator—before initiating an enforcement action. *See* Cal. Health & Safety Code § 25249.7(d)(1). If, after 60 days, "[n]either the Attorney General, a district attorney, a city attorney, nor a prosecutor has commenced and is diligently prosecuting an action against the violation," the private enforcer may bring an action in state court. *Id.* § 25249.7(d)(2). The Attorney General also is authorized to review proposed settlements in enforcement actions initiated by private enforcers and to challenge a proposed settlement that is not in the public interest. *Id.* § 25249.7(f); Cal. Code Regs. tit. 11, § 3003(a).

59.    The private enforcement mechanism of Proposition 65 is unique and allows any

person or law firm to act as a private enforcer to prosecute alleged violations of the Act. Courts and commentators have recognized the widescale abuse of Proposition 65 through private enforcement actions. *See*, *e.g.*, Anthony T. Caso, *Bounty Hunters and the Public Interest—A Study of California Proposition 65*, 13 ENGAGE 30, 31 (Mar. 2012) (describing case in which "law firm created an 'astroturf' environmental group to be a plaintiff in Proposition 65 litigation," which group "consisted of partners from the law firm" and which "sent out hundreds of demand letters charging businesses with failure to provide warnings" and "extort[ing] payments of attorney fees or contributions to the front group").

60.    Significantly, private enforcement actions are pervasive even for chemicals for which OEHHA has adopted a "safe harbor" NSRL. Even where OEHHA has adopted a safe harbor NSRL, the defendant still bears the burden under the statute of establishing as an affirmative defense that any exposures fall within the safe harbor. Cal. Health & Safety Code § 25249.10(c). In alleging an exposure to a listed chemical, a private enforcer is not required to prove that an exposure exceeds the NSRL. *Consumer Cause, Inc. v. SmileCare*, 91 Cal. App. 4th 454, 474 (2001). Instead, under the statute, the burden to prove that the exposure does not exceed the NSRL rests with the defendant business. And proving this negative in court is a costly and time-consuming endeavor, typically requiring expert testimony and evidence. *See*, *e.g.*, *Env't L. Found. v. Beech-Nut Nutrition Corp.*, 235 Cal. App. 4th 307, 314 (2015) (safe harbor defense litigated at trial); *Council for Educ. & Rsch. on Toxics v. Starbucks Corp.*, No. BC435759 (Cal. Super. Ct., June 2, 2017) (rejecting Starbucks's "no significant risk level" defense at summary judgment). In other words, a safe harbor NSRL does not effectively deter a private enforcer with significant financial incentives from initiating suit in the hopes of collecting a settlement.

61.    Furthermore, where OEHHA has adopted a "safe harbor" NSRL, it will be based on conservative assumptions. *See* Cal. Code Regs., tit. 27, § 25703. It also of course must assume that the chemical causes cancer in humans – which assumption is invalid in the case of DEA – in order to determine the level of exposure causing an increased 1 in 100,000 theoretical risk of cancer over a lifetime of exposure to that level. A defendant who disagrees with OEHHA's "safe harbor" NSRL is entitled to present evidence that the true NSRL is higher than the one adopted by OEHHA using

expert testimony and evidence, but no defendant has ever successfully carried this heavy scientific burden.

62.    And where OEHHA has not adopted a "safe harbor" NSRL, as with DEA, the defendant must establish, with extensive scientific testimony, by a preponderance of the evidence, what the appropriate NSRL for DEA is. And then, the defendant must establish that its products, in ordinary use by average consumers, expose consumers to less DEA than the NSRL.

63.    California jurists have recognized how onerous private enforcement suits can be for industry. "[L]awsuits under Proposition 65 can be filed and prosecuted by any person against any business based on bare *allegations* of a violation unsupported by any evidence of an actual violation—or even a good faith belief that a defendant is using an unsafe amount of a chemical known by the state to cause cancer." *SmileCare*, 91 Cal. App. 4th at 477 (Vogel, J., dissenting) (emphasis in original). This burden-shifting regime results in "judicial extortion" where many private parties bring Proposition 65 claims (without an appropriate assessment that an exposure exceeds the NSRL) and force the defendant to settle to avoid legal fees and the costs of performing an expensive expert scientific assessment. *Id.* at 477–79.

64.    Thus, in practice, businesses faced with the threat of costly litigation to prove a defense to the warning requirement often are forced to acquiesce and provide a warning, regardless of whether the businesses know the warning is affirmatively false or misleading. *See* All. for Nat. Health, PROPOSITION 65: *Evaluating Effectiveness and a Call for Reform*, at 7, https://www.anh-usa.org/wp-content/uploads/2015/09/Prop-65.pdf (last visited Feb. 28, 2026); *see also* Editorial, *Warning: Too Many Warnings Signs are Bad for Your Health*, L.A. TIMES, Sept. 30, 2017 (noting "Starbucks, Whole Foods and about 80 other places in California that sell coffee" are exposed under Proposition 65 even though "research increasingly" indicates coffee does not cause cancer), https://www.latimes.com/opinion/editorials/la-ed-proposition-65-warning-coffee-20170930-story.html (last visited Feb. 28, 2026); Richard Berman, *Thanks to a Poorly-Designed Law, California Classifies Soft Drinks as a Cancer Risk*, FORBES, Feb. 20, 2014 (compelling warnings for soda drinks on the basis that if consumers drink "over 1,000 sodas a day" they would have increased cancer risk), https://www.forbes.com/sites/realspin/2014/02/20/thanks-to-a-poorly-

1  designed-law-california-classifies-soft-drinks-as-a-cancer-risk/?sh=49d6eb0eb8c1  (last  visited

2  Feb. 28, 2026); Greg Ryan, *Rice Sellers Threatened with Prop 65 Suits over Lead, Arsenic*,

3  LAW360,  Feb.  20,  2014,  https://www.law360.com/articles/511743/rice-sellers-threatened-with-

4  prop-65-suits-over-lead-arsenic (last visited Feb. 28, 2026).

5      **F.**    **Proposition 65 Listing of DEA and Subsequent Enforcement Actions**

6      65.    OEHHA added DEA to the Proposition 65 list of carcinogens on June 22, 2012. The

7  listing became effective on June 22, 2013.

8      66.    The first Proposition 65 notice of violation based on DEA in personal care products

9  came just two months later. Since then, private enforcers have issued notices to over 1,400

10  businesses.

11      67.    The first set of notices, which were issued between August 20, 2013 and October

12  24, 2018, named approximately 155 manufacturers and retailers of cosmetic and personal care

13  products containing DEA or a related Prop 65 listed chemical, cocamide DEA. According to the

14  Attorney General's database of Proposition 65 private enforcement actions, these notices resulted

15  in settlement payments of approximately $852,225 ($174,875 in civil penalties and $677,350 in

16  attorney fees) by approximately 99 companies. The private enforcer on these notices was Shefa

17  LMV, Inc.

18      68.    The second set of notices, which were dated August 15, 2018 through January 8,

19  2026, named approximately 350 manufacturers and retailers of cosmetic and personal care

20  products. According to the Attorney General's database, these notices have (so far) resulted in

21  settlement payments of $3,756,750 ($319,500 in civil penalties and $3,437,250 in attorney fees) by

22  over 200 companies. These notices were issued by five private enforcers: Precila Balabbo, Ema

23  Bell, Gabriel Espinoza, Anthony Ferreiro, and Donatus McCoy.

24      69.    The third set of notices, which were dated April 25, 2018 through November 12,

25  2025, named approximately 429 manufacturers and retailers of cosmetic and personal care

26  products. According to the Attorney General's database, these notices have (so far) resulted in

27  settlement payments of $673,600 ($45,000 in civil penalties and $628,600 in attorney fees) by

28  approximately 45 companies. The private enforcers on these notices were Initiative for Safer

Cosmetics and Clean Product Advocates.

70.    The fourth set of notices, which were dated November 17, 2023 through February 27, 2026, named approximately 383 manufacturers and retailers of cosmetic and personal care products. According to the Attorney General's database, these notices have (so far) resulted in settlement payments of $2,270,500 ($223,300 in civil penalties and $2,047,200 in attorney fees) by over 90 companies. The private enforcer on these notices was Environmental Health Advocates, Inc.

71.    Although the above four groups of private enforcers are responsible for the vast majority of notices, several other parties have pursued similar claims. From June 10, 2019 through May 6, 2025, other private enforcers named approximately 21 manufacturers and retailers of cosmetic and personal care products. The private enforcers on these notices were Ecological Alliance, LLC and Pure. Clean. Healthy. LLC.

72.    Many of the companies who settled these notices agreed to incur the expense of reformulating or providing warnings on products sold in California.

73.    These notices have resulted in at least 163 lawsuits filed in three different counties' Superior Courts. On April 7, 2025, defendants in several of these lawsuits filed a petition with the statewide Judicial Council to coordinate 33 Proposition 65 enforcement actions on DEA and refer them to one judge for resolution of pre-trial issues, including the controversial technical and scientific issues raised by the complaint in each of these lawsuits. *See* Judicial Council Coordination Petition No. 5383. The petition was granted on September 18, 2025. The Coordination Trial Judge was assigned on November 24, 2025. The coordinated action is pending in Alameda County Superior Court.

74.    The pending notices and lawsuits on DEA include alleged violations related to soaps, shaving products, sunscreen, body lotions, makeup, hair care products, and skin care products.

75.    Notably, although DEA has been on the Proposition 65 list for more than a decade, the number of companies named in 60-day notices increased exponentially in recent years, going from only 31 notices in 2022; to 66 notices in 2023; to 1,043 notices in 2024; and then dropping to

1  209 notices in 2025.

2      76.    As noted, many of these 60-day notices have resulted in lawsuits or settlements, and

3  there is a real and credible threat that other companies are likely to be future targets of Proposition

4  65 litigation related to alleged exposures to DEA in cosmetic and personal care products.

5      **ADVERSE IMPACTS TO PLAINTIFF, ITS MEMBERS, AND THE PUBLIC**

6      77.    If not prospectively enjoined, the Proposition 65 warning requirement for chemicals

7  listed as "known to the State of California to cause cancer," as applied to DEA in cosmetic and

8  personal care products, will have an immediate and irreversible impact on PCPC, its members, and

9  the public.

10      78.    Since 2013, more than 800 companies, including many of PCPC's members that sell

11  cosmetic and personal care products, have been targeted with 60-day pre-litigation notices in

12  connection with alleged exposures to DEA in their products. Many of PCPC's members also have

13  been sued in connection with these 60-day notices. Indeed, several of the companies represented

14  on PCPC's Board of Directors have received 60-day notices on DEA in their products and been

15  sued in connection with such notices.

16      79.    At the same time, due to the presence of DEA in hundreds of cosmetic and personal

17  care products sold in California, some of PCPC's members that sell or manufacture products that

18  are sold in California have not yet been sued under Proposition 65 in connection with some, or all,

19  of their products whose ingredient lists bear the name DEA or the name of chemicals produced

20  using DEA. Because of California's listing of DEA and the attendant Proposition 65 warning

21  requirement, these members must either take action, in conjunction with their distributors and

22  customers, to provide false, misleading, and factually controversial warnings to California

23  consumers about DEA in their products—conveying the unsubstantiated message that DEA in

24  cosmetic products increases cancer risk in humans—or face a significant and imminent risk of an

25  enforcement action seeking substantial civil penalties and attorneys' fees for failing to do so.

26      80.    Alternatively, PCPC's members that have not yet been sued may need to undertake

27  costly exposure assessments for their DEA-containing products to demonstrate that any exposures

28  to DEA from their products do not exceed the NSRL and do not require warnings. And even if

19

PCPC's members' assessments indicate that exposures to DEA from their products do not exceed the NSRL, they still would need to prepare to defend against likely enforcement actions by private enforcers. Private enforcers are not required to defer to a company's exposure assessment and may dispute the exposure assessment. Thus, a company that wishes to defend its exposure assessment and to prove that an exposure does not exceed the NSRL faces the prospect of costly and risky litigation on a technical and expert-heavy defense.

81.    The requirement to place a false, misleading, and highly controversial Proposition 65 cancer warning for DEA on cosmetic and personal care products has had, and will continue to have, a substantial adverse impact on PCPC's members. Such a warning disparages PCPC's members and their products by creating the false impression among consumers that those products are unsafe and increase human cancer risk, despite the absence of scientific evidence establishing that DEA in cosmetic and personal care products poses a significant risk of cancer in humans.

82.    Applying a false, misleading, and highly controversial Proposition 65 cancer warning on cosmetic and personal care products also would have a substantial adverse impact on the public.

83.    First, a Proposition 65 cancer warning for DEA in cosmetic and personal care products would mislead consumers about the human health risks posed by cosmetic products containing DEA, frighten consumers away from safe cosmetic products, and possibly cause anxiety over historical use of familiar personal care products.

84.    Furthermore, requiring businesses to apply a Proposition 65 cancer warning for DEA in cosmetic and personal care products, despite the lack of scientific evidence supporting a finding that DEA from cosmetic products increases human cancer risk, dilutes the effectiveness of legitimate Proposition 65 warnings. *See*, *e.g.*, RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY § 2 cmt. j (1998) (noting that excessive, multitudinous warnings "may be ignored by users and consumers and may diminish the significance of warnings about [other] risks" and "could reduce the efficacy of warnings generally."); *Nicolle-Wagner v. Deukmejian*, 230 Cal. App. 3d 652, 661 (1991) ("'[U]nnecessary warnings . . . could distract the public from other important warnings on consumer products.' Since one of the principal purposes of [Proposition 65] is to provide 'clear

and reasonable warning' of exposure to carcinogens and reproductive toxins, such warnings would be diluted to the point of meaninglessness if they were to be found on most or all food products.") (quoting the Final Statement of Reasons for the "naturally occurring" regulation now found at CAL. CODE REGS. tit. 27, §25501)); *accord Johnson v. Am. Standard, Inc.*, 43 Cal. 4th 56, 70 (2008) (quoting *Finn v. G.D. Searle & Co.*, 35 Cal. 3d 691, 701 (1984)).

85.     Indeed, the California Supreme Court in another context has recognized that excessive warnings "produce a cacophony . . . that by reason of their sheer volume would add little to the effective protection of the public." *Thompson v. Cnty. of Alameda*, 27 Cal. 3d 741, 754–55 (1980); *see also Dowhal v. SmithKline Beecham Consumer Healthcare*, 32 Cal. 4th 910, 932 (2004) ("The problems of overwarning are exacerbated if warnings must be given even as to very remote risks . . . . Against the benefits that may be gained by a warning must be balanced the dangers of overwarning and of less meaningful warnings crowding out necessary warnings, the problem of remote risks, and the seriousness of the possible harm to the consumer.") (internal citation omitted).

86.     An order enjoining future enforcement of the Proposition 65 warning requirement for cancer as applied to DEA in cosmetic and personal care products would redress the harms described above.

## CLAIMS FOR RELIEF

### COUNT I

### (Violation of the First Amendment to the U.S. Constitution — 28 U.S.C. § 2201)

87.     The foregoing Paragraphs are incorporated by reference as if set forth in full herein.

88.     The Free Speech Clause of the First Amendment of the United States Constitution provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. The Fourteenth Amendment of the United States Constitution made this proscription applicable to the States and their political subdivisions. *See id.*, amend. XIV, § 1.

89.     In addition to providing protections against restrictions on speech, the First Amendment provides protection against the government compelling individuals or entities to engage in speech.

90.     Under the First Amendment, laws compelling speech ordinarily receive strict

scrutiny. *See Wooley v. Maynard*, 430 U.S. 705, 715–16 (1977). Laws regulating commercial speech generally receive at least intermediate scrutiny, *i.e.*, they are prohibited if they do not directly and materially advance the government's interest, or are more extensive than necessary. *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 566 (1980). And even laws that require businesses to provide information in connection with commercial transactions are permissible only if the compelled disclosure is of information that is purely factual and uncontroversial, reasonably related to a substantial government purpose, and not unjustified or unduly burdensome. *See Nat'l Inst. of Family & Life Advocates v. Becerra*, 585 U.S. 755, 768, 776 (2018) ("*NIFLA*"); *Zauderer v. Ohio Sup. Ct. Off. of Disciplinary Counsel*, 471 U.S. 626, 651 (1985). The Government bears the burden to show that a compelled disclosure is permissible under the First Amendment. *Small Bus. Fin. Ass'n v. Mohseni*, 2025 WL 1111493, at *3 (9th Cir. Apr. 15, 2025).

91.    A Proposition 65-compliant cancer warning—irrespective of the specific language used—conveys to the average consumer of products intended for human use that the chemical at issue (here, DEA) causes cancer in humans.

92.    Contrary to the warning mandated by Proposition 65, there is no scientific evidence that DEA causes cancer in humans. Rather, independent review of animal studies suggests that there is no association between exposure to DEA products and cancer in humans.

93.    Nor does California "know" that DEA causes cancer. Instead, Proposition 65 requires California to place DEA on the list of chemicals "known to the State to cause cancer" simply because IARC determined it is a possible human carcinogen based on one study in one strain mice.

94.    Moreover, even IARC has not said that it "knows" that exposure to DEA causes cancer in humans. Rather, it has only identified DEA as a "possible" human carcinogen based on one highly suspect study on a specific strain of mice. Indeed, IARC concluded: "There is inadequate evidence in humans for the carcinogenicity of [DEA]." *See* ¶ 4, *supra*.

95.    The use of the word "known" in the compelled cancer warning for DEA is therefore misleading at best. *Nat'l Ass'n of Wheat Growers v. Bonta*, 85 F.4th 1263, 1278 (9th Cir. 2023)

("*NAWG*") ("Under Prop. 65, a 'known' carcinogen carries a complex legal meaning that consumers would not glean from the warning without context and thus, use of the word 'known' is misleading") (internal quotations omitted) (citing *Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 479 (9th Cir. 2022)).

96.    The Proposition 65 cancer warning requirement as applied to DEA in cosmetic and personal care products thus compels speech that is false, misleading, and factually controversial. *NAWG*, 85 F.4th at 1278 ("From the standpoint of an average consumer, saying that something is carcinogenic or has serious deleterious health effects—without a strong scientific consensus that it does—remains controversial.").

97.    Because Proposition 65's cancer warning requirement as applied to DEA in cosmetic and personal products is false, misleading, and factually controversial, it cannot survive any level of constitutional scrutiny. *See Video Software Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950, 967 (9th Cir. 2009) ("[T]he State has no legitimate reason to force retailers to affix false information on their products."). Proposition 65's cancer warning requirement as applied to DEA in cosmetic and personal care products therefore constitutes impermissible compelled speech under the First Amendment.

98.    In the alternative, the Proposition 65 warning requirement also is unconstitutional on its face. In *NIFLA*, the U.S. Supreme Court made clear that the State has the burden to show that a warning is "justified" before it may compel a business to provide one consistent with the First Amendment. *See* 585 U.S. at 776. A Proposition 65 warning requirement is "justified" only for an exposure to a listed chemical at a level that exceeds the NSRL. Proposition 65, however, reverses this burden, stating that "the burden of showing that an exposure [poses no significant risk] shall be on the defendant." Cal. Health & Safety Code § 25249.10(c). The Proposition 65 warning requirement is thus unconstitutional on its face because it places the burden on the business to disprove that a warning is justified, when *NIFLA* and other U.S. Supreme Court precedent hold that it is the government's burden to prove that a warning is justified.

99.    PCPC's members include entities that have already been harmed by California's requirement to provide a false, misleading, and/or highly controversial cancer warning for DEA in

cosmetic and personal care products, and will be injured further if forced to either comply with Proposition 65's compelled false warning requirement, or incur costly other burdens and face the threat of private enforcement suits or other enforcement actions.

## COUNT II

**(Violation of the First Amendment to the U.S. Constitution — 42 U.S.C. § 1983)**

100.    The foregoing Paragraphs are incorporated by reference as if set forth in full herein.

101.    42 U.S.C. § 1983 provides in relevant part that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ."

102.    The Proposition 65 cancer warning requirement as applied to DEA in cosmetic and personal care products compels speech that is false, misleading, and factually controversial.

103.    Because Proposition 65's cancer warning requirement as applied to DEA in cosmetic and personal products compels speech that is false, misleading, and factually controversial, it cannot survive any level of constitutional scrutiny. Proposition 65's cancer warning requirement as applied to DEA in cosmetic products therefore constitutes impermissible compelled speech under the First Amendment.

104.    In the alternative, the Proposition 65 warning requirement also is unconstitutional on its face under the First Amendment.

105.    PCPC and its members are persons within the meaning of 42 U.S.C. § 1983 and have a right to free speech (which includes the right not to speak) under the First Amendment to the United States Constitution, as applicable to the States and their political subdivisions through the Fourteenth Amendment to the United States Constitution.

106.    PCPC's members include entities that have already been harmed by California's requirement to provide a false, misleading, and/or highly controversial cancer warning for DEA in cosmetic products and personal care, and will be injured further if forced to either comply with

Proposition 65's compelled false warning requirement, or incur costly other burdens and face the threat of private enforcement suits or other enforcement actions. PCPC's members also include entities that have not yet been targeted in private enforcement actions for exposures to DEA in certain cosmetic and personal care products but—because of the presence of DEA in hundreds of cosmetic and personal care products on sale today in California—face a real and credible threat of being targeted in future enforcement actions.

107.    Defendant is responsible for enforcing Proposition 65 and does so under color of state law. In addition, private enforcers under Cal. Health & Safety Code § 25249.7(d) also act under color of state law because, *inter alia*:

(a)    Private enforcement actions are authorized by state statute to be brought only "in the public interest." *Id.* § 25249.7(d);

(b)    Private enforcers must provide notice to the Attorney General and other public prosecutors before initiating an enforcement action. *Id.* § 25249.7(d)(1);

(c)    The Attorney General screens and evaluates private enforcers' notices of prospective enforcement actions and is obligated to object to any enforcement action he believes lacks merit. *Id.* § 25249.7(e)(1)(A);

(d)    Private enforcers may initiate an enforcement action only if the Attorney General and all district attorneys and city attorneys of certain large cities have not begun prosecuting the alleged violation themselves, *id.* § 25249.7(d)(2);

(e)    The State, through the Attorney General, is authorized to review and challenge proposed settlements in private enforcement actions, *id.* § 25249.7(f); and

(f)    Seventy-five percent of any penalties assessed in private enforcement actions go to the State treasury, *id.* § 25249.12.

108.    In other words, private enforcers of Proposition 65 stand in the shoes of the State when enforcing the Proposition 65 statute. The activities of "persons in the public interest" are both directly and indirectly regulated, monitored, controlled, and guided by the California Attorney General.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendant as follows:

1.    A declaration, pursuant to 28 U.S.C. § 2201 and/or 42 U.S.C. § 1983, that the Proposition 65 warning requirement for DEA, Cal. Health & Safety Code § 25249.6, as applied to cosmetic and personal care products, violates the First Amendment of the United States Constitution.

2.    In the alternative, a declaration, pursuant to 28 U.S.C. § 2201 and/or 42 U.S.C. § 1983, that the Proposition 65 warning requirement, Cal. Health & Safety Code § 25249.6, on its face violates the First Amendment of the United States Constitution.

3.    Prospective preliminary and permanent injunctions, pursuant to 42 U.S.C. § 1983 and other applicable law, prohibiting Defendant or any of its officers, employees, or agents, and all those in privity with and/or acting in concert with those entities or individuals (including private enforcers of Proposition 65 under Cal. Health & Safety Code § 25249.7(d)), from enforcing or threatening to enforce in the future, in cases not currently pending, the Proposition 65 warning requirement for cancer with respect to DEA in cosmetic and personal care products.

4.    All costs, attorney fees, and expenses that Plaintiff reasonably incurs, *see* 42 U.S.C. § 1988; and

5.    Such other and further relief as this Court deems just and proper.

Dated: March 2, 2026                     Respectfully submitted,


                                         By: */s/ Trenton H. Norris*
                                         Trenton H. Norris (CA Bar No. 164781)
                                         Alexander Tablan (CA Bar No. 346309)
                                         Andrew Muse-Fisher (CA Bar No. 364086)
                                         HOGAN LOVELLS US LLP

                                         *Attorneys for Plaintiff*
                                         *The Personal Care Products Council*

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF